Thank you. Good morning. May I please the court? My name is Lopez at Kitty Atlas, and I represent the County of Santa Clara. I'd please like to reserve three minutes for rebuttal. The county's issues on appeal are twofold. First, whether the plaintiffs were afforded due process. And second, whether plaintiffs established a Section 1983 claim against the county under any theory of Monell viability. As for the Monell claim, under Section 1983, municipalities cannot be liable under a theory of respondeo superior liability. And there is no evidence to support a Section 1983 claim against the county under any of the paths to Monell viability. First, there's no evidence of a formal governmental policy of violating an employee's right to due process in the manner in which the county recoups overpaid wages. What about the memorandum of agreement? Is that a county policy? Your Honor, it is a county policy. The collective bargaining agreement was reached between the county and the Plaintiffs' Union. But under that policy, the formal policy is to collect overpaid wages. And the policy sets forth that the county is to collect it in the same number of pay periods and in the same amount in which the overpayments were made. And if employees protected by the collective bargaining agreement disagree with the county's methodology, they can file a grievance and pursue binding arbitration through the process and forth in the collective bargaining agreement. Let me ask you a question. Is there anything that the county did in this case that's contrary to the county's own policy? No. Well, then it sounds like we should go to whether or not what they did violate a due process because it sounds like everything they did was pursuant to county policy. That is to say, if it violated due process, you're in trouble under Monell. But if it didn't violate due process, you're fine because you just told me that everything the county did was pursuant to county policy. Well, what the county did was collect overpaid wages in accordance with the collective bargaining agreement. Now, the plaintiffs contend that the county took more than what it should have. So we have a dispute about that. So that would go to whether the county committed a due process violation. But regardless of whether the calculations are correct or not, on the issue of the constitutional violation, the issue is whether the county provided the plaintiffs meaningful notice and an opportunity to be heard. And they did because in November of 2010, the county notified the plaintiffs that they had been erroneously overpaid a four-hour minimum for each of their callbacks and that the county would recoup the overpaid of the overpayments in accordance with the collective bargaining agreement. The county provided written notice to the plaintiffs in January of 2011 of how the recoupment process would work. The plaintiffs contacted their union, and the union filed grievances on behalf of the employees. And in March, the county denied the grievances and again reiterated how the overpayment error was discovered. And how the recoupment plan would be instituted to recoup the overpaid wages. Counsel, do you agree that we separate the due process claim into pre-deprivation and post-deprivation phases? Yes, we did look at the pre-deprivation phase. We heard, as I mentioned, through the notification process. And then the county had the first step-through meeting with the plaintiffs in April of 2011. During which they provided additional information, including the county's audit of the plaintiff's payroll records. And the plaintiff's response to that was that it was unfair that they should be paying a standard four-hour minimum. Even though they did not achieve that permit in collective bargaining negotiations. And that their category of employees were explicitly excluded from employees that would receive a four-hour minimum. But the plaintiffs didn't during that pre-deprivation meeting. They did not offer the county an alternate methodology for how the county should calculate the overpayment. So the county explained that they relied on the plaintiff's home swiping in to come to work. And swiping out when they left. And at what point did the plaintiffs say, I just am not satisfied with the way this revenge process is working. How far has the revenge process proceeded at the time they said, okay, we're out of here and we'll get a final lawsuit? They were at this step-through area. And so that was when they were meeting with the county's labor relations representative. They had not gone to a pre-arbitration meeting or binding arbitration. Where they could have put forth all of the same information that they told the jury in this case. They could have told it to a neutral arbitrator. Or further procedures were still available to them under the procedures outlined in the collective bargaining agreement. Absolutely. Up to and including arbitration. Up to and including arbitration. That's correct. So at the first step-through meeting, the plaintiffs didn't offer an alternative on how the county should calculate it. And the county relied on, as I said, the plaintiffs when they swiped in and when they swiped out. And in instances when the plaintiffs forgot to swipe in, they were to complete a form called an exception form. And under the exception form, they were to write the actual hours that they worked. And the exception forms in the record in this case demonstrate that the plaintiffs actually recorded, on the three forms that are in the record, a little over an hour each for each callback. So that is inconsistent with their theory that they believed they were entitled to a four-hour minimum. Had they really believed that, presumably they would have written four hours on each of the exception forms when they were called back. So the county then made the deductions, beginning with a May 6, 2011 paycheck, after giving plaintiffs time to provide additional information with regard to their disagreement with the calculations. And then the county, as we discussed, continued to offer plaintiffs the opportunity to submit additional information if they believed the county's calculations were wrong and the plaintiffs could have gone forward to binding arbitration, where they could have put forth their information in kind of a neutral arbitration. With the permission of my colleagues on the bench, what I think would probably be a sensible thing to do now, is that you may understand your position, be here on the other side, and then allow your rebuttal on this question. And then we'll deal with the cross-appeal once we've finished this back-and-forth task in this part of the case. Thank you, Your Honor. Good morning, Your Honor. My name is Jason Clark. My name is Carl Bonner. I'm with my co-counsel, Charles Bonner. We represent the plaintiffs in this action. We've been suing NTC. I think what's important to remember with respect to this case is that during the trial, the jury verdicts returned a very conclusive actual finding that the penalty wrongfully took from this sum over $33,000. It sounds like it was just a contract claim. It is a due process claim, Your Honor, because of the way the money was taken. In this case, there was an overpayment of wages, that's true. In the context of recouping those wages, the judge failed to provide an adequate pre-deprivation process. When we look at what process was provided, now are you saying that the process outlined in the collective bargaining agreement for revenge is constitutionally deficient? I think that it is possible to be considered as constitutionally deficient because they did not give them that process before beginning their recoups. But Your Honor, the discipline court law pre-deprivation process is not restringent, so how do they then give a notice and an opportunity to be heard that satisfies the constitutional requirement? Well, it all depends on what is in that notice and what happens with that opportunity to be heard. The notice has to provide the whole purpose of due process. It's to give to avoid erroneous deprivation. So the process that's provided has to provide, even pre-deprivation process, has to give enough information for the plaintiffs that are clients to challenge the GOT's numbers. So if you look at what happened with the January 18th letter, this was the first letter informing them of the overpayment. This included indications that there were large numbers of hours that were, quote, incorrect, large number of hours that were correct. There was no, there were none, they were not provided with side cards. There was still pre-deprivation. The side cards were provided pre-deprivation. I will get to that point. The side cards were provided on April 11th, 2011. That was two years' worth of side cards. The deprivation happened on April 25th of 2011, two weeks later. There was no intervening opportunity between providing them with the side cards on April 11th and starting the deductions on April 25th for the plaintiffs to challenge the total amount of the overpayment. It's the total amount of the overpayment that led to the erroneous keeping of over $50,000 into plaintiffs' accounts. Now at the time that your clients abandoned the grievance process and filed lawsuit, how much money had been taken from their paychecks? The clients, first of all, did not abandon the grievance process. The record is clear. Well, maybe you want a different word, but they said, we don't want to do this anymore. They never said, we don't want to do this anymore. They maintained their grievance. It was the uncontroverted testimony that the SCIU, the union, dropped the grievance. Well, they dropped the grievance only after your clients filed suit. Yes, but there was no intimation provided to the clients. They couldn't maintain both their actions. The grievance process was dropped by the union in December. But before I get there, I gather there was a proposed settlement that the union recommended that your clients sign. Your clients didn't want to sign that, and so at that point they filed suit. The proposed settlement agreement required them to drop their grievance. That was truly a settlement agreement. It required them to agree with the county regarding the amount of money, the total amount of the deductions, which they didn't agree with. It required them to release the county for any amounts that they claimed the county owed to them. Is that true? Did your clients ever threaten or reach suit against the union for violation of their duty of fair representation at the grievance process? No, they did not. They wanted to maintain the agreement, which is why they didn't sign the settlement agreement. It was about a year, a little over a year worth of deductions, but the union informed them illiterately that the union was going to drop their grievance. But the free deprivation process, they don't want to lose your side of that. That's what's most important. If you look at Matthews v. Eldridge, right, this is the case that sort of sets out what's required for a process. If you look at the free deprivation process that was provided to that plaintiff, he was provided with all of the information that the agency used in making the determination for free deprivation. He was provided with an opportunity to provide additional information, free deprivation. He was provided all of the rationale that would underlie the agency's decision. Free deprivation. Correct me if I'm wrong. How real is that with a little bit of business? Did your clients file suit? Yes. How much money had been taken out of their paychecks by the county? I don't know the exact number. It was they filed suits. I believe during the summer the payments started being deducted. In April of 2015, the first paycheck deduction was in May. I don't know the exact number. That was it. I see where you're going with this question. At that time, was the money that had been taken out of their paychecks less than the amount that your clients have seen that they had been overpaid by? I don't know, but I don't think that it's relevant. No, you don't know. It was less. It was less. How much money did your clients concede was overpaid? Ms. Song concedes that she was overpaid by about $30,000 to Mr. Sheehan. Right. And so how much was the deduction per paycheck? The deduction per paycheck was $16,000 for Ms. Song. Per paycheck. I don't mean total. I mean per check. It was $16,000 per check for Ms. Song and a little over $1,000 per check for Mr. Sheehan. My understanding is that they believe it was that the amount of recoupment would have been recovered over a very substantial period with a fairly small deduction per paycheck. Am I mistaken in the record? It was a large amount of money, $16,000, is what was claimed. Per pay period. Per pay period. My recollection of the facts was that it was $16,000 per check. $16,000? $16,000. Oh, I'm sorry. $16,000. My apologies. But it's something to look at. It appears to me that the type of clients that conclude the amount that had been taken out of their paychecks because of the overpayment was well within the amount of conceded overpayment if they did continue. And, of course, they would have gotten into the discredited amount. Also, I'm living in a very troubled state. How does this easily end to pre- and post-deprivation because the money taken out of your client, I'm inquiring also, was money your client conceded and then overpaid? A check was included both payment amount that was correct and overpayment that was incorrect. Each check. The problem is that the Constitution requires a pre-deprivation process, right? Until there's a conversation about what incorrect or overpayment is. My point is the amount that has been deprived of the time your client filed suit is how your client concedes is owed back to the county for having been overpaid. I understand that. But what we're talking about is due process. I mean, I'm mainly talking about interest. But is there an injury? Yes. But is there an injury at that point? If the amount of money that was taken out was less than the amount that succeeded to be owed, what would be your injury at that point? The injury is that the amount needs to be quantified before the deductions began in order to assure that there's a correct amount taken out. But the case says that the amount would have to be quantified before the deprivation to comply with due process for a case that says that. There is a California case, Efthanakis, which is pretty clear on this exact point we've cited in our briefs. And in the Efthanakis case, which is a California case, the court said that prior to beginning the deductions, notice that opportunity occurred immediately. That's a different principle than saying that the exact amount has been calculated and agreed upon as a part of the pre-deprivation notice process. But I don't think it is because the purpose of the process is to avoid and release deprivation. And it's unfair to require them to go through this whole process while a long amount of money is being taken from them and hold the process to convince them that it was a long amount of money. As the post-deprivation part of it, the pre-deprivation part of it, if you haven't suffered a loss, it's hard to see how you've been deprived of the opportunity. You have been deprived because the guilty is saying, we're going to take $68,000 away from you. You know that's incorrect amount of money. You know that's the guilty's own errors which has resulted in this overpayment in the first place. So to require a citizen to let them take all of that $68,000 and have to go through arbitration to get it back, there's no guarantee that the arbitration process is going to start. It would take too much power in the government to deliver that you have to lose all of your money and then fight to get it back. The same thing was true with the lawsuit. You're in the same position right now in the lawsuit. And if you didn't get it, you weren't able to get the relief in advance of the lawsuit. So what was the difference between filing a lawsuit and completing the grievance procedure with arbitration? The lawsuit's intention was to stop it immediately, to put the county on notice that there's a lawsuit now, and then you should stop this deque, this one. But I do want to get back to the issue of the pre-deprivation process because if you look at the process that was provided, if Gale's provided enough information, pre-deprivation, for which the plaintiffs could challenge the amount, and that's what we see in math as the alteration. So you spot, on the pre-deprivation process, what evidence is there in the record that this was more than a one-time deque, such that it became a policy, a practice in the county, as opposed to a one-time? Well, we know that Margaret Torrey, who was the payable manager, described the standard procedure, those words that she used, and in that standard procedure she describes exactly what happens in an overpayment case. And what happens is they determine there's no overpayment. They calculate the amount that's due. They calculate the amount they're going to take from each check. They send it to labor relations, and then labor relations starts the deduction. There's no opportunity in that process for someone to have a pre-deprivation hearing assuming that there was an incorrect amount. That process is set up assuming that a hundred percent of the time they're correct. But if they're not correct, then that process creates a due process violation by not giving an opportunity for the employee to be heard on the total amount of the deduction. And that's what happened in this case. We followed their policy. Is there evidence in the record of other folks in your client's situation where this happened, too, as opposed to someone saying, here's our policy, here's our practice, if no one else was injured? We don't have evidence of other people who had incorrect balance of overtake, other great recruits. But the policy is what was followed. We also have evidence from Pablo Pineda, who was the final decision-maker, regarding when the overpayments, when the recruitment payments were due. Was he a final decision-maker? He was, as to when the payments were going to begin. But does that make him a final decision-maker for purposes of the cost of an XB-3? Yes, it does. Because what injured them, with respect to pre-deprivation, post-deprivation, was providing the information on April 11, 2011. That's when they have the information that they could conceive to challenge the county's numbers on it. That's what they have at that time. And he said, we're going to start these recruitment payments two weeks from now on April 12th. Did he say he didn't have authority to change that decision? No, he had authority to change the date that the payments were starting. Clearly, he didn't have authority to change the total amount of overpayment, which is another point that I'm having at record brought up. Because in Weingarten, what the court said is that, at the minimum for pre-deprivation process, they have to have an opportunity to have at least an informal conversation with a designated personnel empowered to correct the mistaken determinations. So that April 11th, even the May 6th meeting, after they started recruiting the payments, were not with someone empowered to correct the mistaken determination. So he shouldn't have, on April 11th, cannot satisfy their pre-deprivation due process requirements, because it was with someone empowered to make a change. And that's what satisfied the final decision review? Well, it's not a different issue. The final decision-making authority was expected to when the recruitments began. There's nothing in the policy that says you have to give them all the information and then only give them two weeks. They could have said, look, this is a complicated situation. We know that there were some errors made. The time cards, the mathematical errors that the timekeeper made were incorrect. They just said, why don't you set the time, recreate your time cards, and we'll start recouping this money once you've had opportunity to explain to us why you did this wrong. But that's not the policy. There's a policy in this case. It's the Memorandum of Understanding of Agreement. So the policymaker would have to be someone who has the authority to change that policy. No, the policy is silent as to when the recruitment periods begin. That was determined as a decision by Pablo Pineda as the final policymaker on when those pre-pre-recruitment periods were began. Policymakers are generally high-ranking people, like the people who implement day-to-day decisions. If you have a case that says someone who is a labor relations analyst can be a policymaker for the county, usually they're pretty high-ranking, like assistant county managers, county managers, someone on that level. I think that policymakers are defined by whether they have the authority with the policy of the decision that they made. It doesn't have to be someone who's writing county-wide policy. He was making a policy-level decision regarding his group level income. It was when these three payments were going to begin. That was his testimony. And the jury could look at that testimony and make a determination, but he had the authority to determine that. He could have said, okay, well, why don't we wait six months, give you an opportunity to review your time cards, and then we'll talk about it more. That was within his authority to do what he chose. Do you have any further questions? Thank you. We'll go to the last of the guests, and then we'll get to the rest of you. Thank you, Your Honor. Also, can I ask you if you agree that the labor relations individual was a policymaker for the county? I do agree, Your Honor. Mr. Pineda was a lower-ranking labor relations representative. He testified that he would need to get permission from his supervisor, the labor relations director, and even that person is not considered an official policymaker, like a board of supervisors or a county executive, such that a decision by Mr. Pineda could be attributable to the county of Santa Clara. Due process is flexible. There's no prescribed formula for what would satisfy the requirement of procedural due process, and here the pre-deprivation process where the county gave the plaintiffs written notice. The county had a face-to-face meeting in April where they provided them with the county's calculations, provided more than adequate pre-deprivation due process. Plaintiffs have yet to say what the county should have done, how much time. If two weeks wasn't adequate, would four weeks be adequate? Four months? Four years? It's unclear. The plaintiffs were on notice. They had an opportunity to be heard. They were advised that they could provide additional information before the recoupment plan was instituted in the May 6, 2011 paycheck, and they didn't respond. So the district court in this case was of the view that the potential due process violation was the county taking more money than the county was entitled to take. What was wrong with the district court's conclusion in that regard? What was wrong with the district court's conclusion is that the due process clause does not require that the plaintiffs agree with the county's calculations or even if the county's calculations be perfect. I mean, we strive for perfection, but that's not what the due process clause requires. The due process clause requires notice and an opportunity to be heard. That's exactly what the plaintiffs received in this case. They also had, at the pre-deprivation stage, they also had post-deprivation procedures available to them, as we've discussed. They could have gone to further century-old meetings, and they could have gone to binding arbitration, which they elected not to do because they stopped communicating with their union representatives. And as the court had pointed out, at the time they filed this lawsuit, they still had not been deprived of any of the money that they even claimed they were deprived of because the county had still not reached the amount that the plaintiffs conceded that they owed by the time they filed their lawsuit in January of 2012. As to the Modell claim, I'd like to return to while the collective bargaining agreement sets forth just what the recruitment process is, the plaintiffs are challenging the recruitment process itself. They're challenging that they did not receive sufficient opportunity to be heard. Well, the county, as we discussed, gave them notice of an opportunity to be heard. There's no formal policy that says that counterfeit employees are not to be given an opportunity before a recruitment plan is instituted. There's not even a longstanding practice or custom. All we have is the experience of these two plaintiffs. There's no evidence, as your Honor pointed out, that this has happened to other county employees. We have no official policymaker with final policymaking authority because we have a timekeeper who conducted an audit, a payroll manager in a different county department who reviewed that audit himself. Respond, Mr. Bonner. In response to my question, did your witness testify in some numbers of the consequences of these things? Well, Ms. Torian testified that what they do is when they identify an overpayment error, they correct the overpayment and recoup that overpayment from an employee's stipend. She did not testify that the county has a policy or practice of taking more money than what is owed. So the county's practice is that if an employee is overpaid by $100, they recoup $100 back from the county. And her testimony clearly was indicating that that's what the policy is not, that the county, if an employee owes $100, that the county takes $200 back. And Ms. Torian, by the way, is not. She's a payroll manager in the comptroller's office, which is yet a different county department than where the plaintiffs worked and where Mr. Pineda worked because Mr. Pineda worked in the labor relations division of the county. So none of these people could be said to be policymakers on behalf of the county of Santa Clara. And no one with final policymaking authority ratified any of the decisions. There's no indication that anyone with final policymaking authority was even aware of the grievance process until, you know, the litigation. And we still didn't even have from a person with final policymaking authority testify at trial. There's no evidence in the record then to support a Monell claim against the county. Okay. Thank you. Thank you. Now, we used up all of your normally allocated 15 minutes, but we've got enough to fail. So with these, I'm going to give you five minutes total for that argument. Now, I tell you, I thought it was your co-counsel was going to argue this one, but however you want to do it. So this is about five minutes total for this question. Okay. Thank you. We're going specifically to you since the Supreme Court has held that. First of all, let's just get the product. How much did you request in fees, or how much did the district judge give you? The request was somewhere in the area of $600,000. Okay. And I don't know the precise number. No, because our appeal isn't to the full amount. So it's a very specific issue with respect to the attorneys' fees. The specific issue that we have here, what was the total amount the district judge allowed? Roughly $300,000. Okay. The concern I have, and the reason we think there was an increase in discretion, is the court obviously does have discretion because of the fees, because of the hourly rate. We're not arguing that. But the court did, based on our release information, we submitted a declaration on behalf of Charles Bonner for the hours that he worked on the case issues. And those hours totaled 416.9 hours. Unfortunately, due to an error in the WordPerfect table that we utilized to calculate those numbers, the declaration showed 312.9, and that's at supplemental excerpts for Record 83. That 312.9 number of hours was wrong. It was incorrect. And if you look at all of the hours included in that declaration, if you add them all up, which we did, it adds up to 416.9 hours. We were requesting for Charles Bonner $700 an hour, which equates to $291,830, which was correct. And that's also on the district judge that narrowed the rate somewhat. Well, yes, yes, but more importantly, we learned about the calculation error on April 30, 2013. Are you objecting to the cutting back on the hourly rate? We are objecting to the cutting back on the hourly rate. Are you also objecting to the district judges cutting back on the amount requested for the driving time between socially and overseas? We are not really concerned with that right now. Why are you objecting to that? He said that it should not have been 100% reduced, but a 50% reduction would be reasonable. That's what we're asking for. And how much was included for the driving round-trip per day to the districts from between Sausalito and San Jose? I believe it was, to the court, about $1,600 an hour. That's what I requested for each round-trip driving between Sausalito and Sausalito. It was the hourly rate of $700 an hour times the number of total hours. It was $2,800 per day driving? Yes. Okay. Our primary concern, where we think there was an issue of discretion, was not starting the calculation of Charles Bonner's hours with the correct number. We provided notice to the court that 2012 was incorrect. We provided that notice on May 1, 2015. We alerted the court that the correct number of hours should have been 416.9 hours, and that was the number of hours in the declaration. The court has the discretion to cut the travel time. I'm not arguing with that. I agree with you. The court has the discretion to determine that to me hours were billed in conjunction with my work in this program. I'm not arguing with that. But if the court does not notice that the number of hours is off by 100, then at the very least, he should start his analysis with the correct number. If he's going to cut from there, he can cut from there. But it's a double whammy to start the analysis with an erroneous number. We also disagree with the fact that no hours were provided for the work we did on the successful opposition to the Judgment of Bonner's Law. And we do disagree with the cutting of the expenses from 700 to 550, primarily because the result we got was 100% of the economic damages played by our clients. Now, you're down to just under a minute. Would you like to save that for a moment? Yes. Thank you. Thank you, Your Honor. I will be very brief. On the attorney's case, while the court did not abuse its discretion, as for the reduction of the hourly rate, there was only one constitution. So my focus is on the miscalculation of the number of hours. Could you address that? Sure. The district court acknowledged that there were calculation errors, and the court looked at the evidence that had been presented in the record, and it made its own calculations based on the evidence that had been submitted. So the court acknowledged that the plaintiffs had submitted additional information, but it nevertheless took it upon itself to do the best the court could do based on the information provided to calculate the number of attorney hours. And Your Honor is right. The plaintiffs were acclaiming $2,800 per day for travel time, and the court indicated that the plaintiffs could have stayed in a hotel, which would have significantly reduced the amount of cost for travel. As for the hourly rate, the court pointed out that the plaintiffs did no discovery. They failed to make disclosures. They did not take any depositions. They didn't do written discovery, and they didn't disclose certain evidence and witnesses until the eve of trial, and that evidence and those witnesses were excluded. So in terms of the reduction of the hourly rate and the number of attorney hours, the court did abuse its discretion, and that ruling should be upheld if the court finds that the plaintiffs have established their claims. Thank you. Thank you. I have a special matter for you, Your Honor. If you could just speak a bit to what I was told, Your Honor, on behalf of the plaintiffs. The law is that private attorney jurors are to be paid every penny of the time that they put in trying to medicate the Constitution. Due process is a very serious but yet complicated issue. As can be seen by the six years of litigation, they have these plaintiffs' money in their pocket. It is our job to make them pay it. They have another disputant that they owe this overpayment. The jury found that they owe this overpayment. They let us work from April 2011 to now six years. It took them six months to start taking back money that they claimed they owed or owe back, but yet it's been six years before they will get these low people their wages. And Ms. Sullivan approached me and she said, listen, we're from China, and the Chinese have no rights, but can they take money in America? I said, no, because we have the Constitution. Due process matters. The Constitution matters. But it has taken us this long and put in all of this time on a contingency constitutional case to get them to go to a jury and pay this money back. The fees were reasonable. Those laws should have a multiplier because that's how important our Constitution is. Governments should not take advantage of ill people because they are disadvantaged and make them wait six years to get their wages back. Wages are very important under public policy in America. They're not like passive income. Wages are hard earned. No one in this courtroom will allow their wages to be taken for six years without crying that this is unfair. And that's what Ms. Sullivan said, this is unfair. In China, perhaps, but not America, he asked that China not only import everything that they're trying to seize, but add a multiplier to the low stock. Thank you. Thank you. The case of Song et al. v. Cunnington. There is no sufficient score. This is a cheap vote. All three of you for your arguments. And the next case on the argument, again, one of the foreign views, while equity is considered versus EPA, this would be a 15-175 score.
judges: W. Fletcher, Rawlinson, Gordon